UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA   :
             :
             :   **<u>OPINION AND ORDER</u>**
 - against -       :
             :    14 Cr. 43 (ER)
             :
KOWAN TURNER,     :
             :
       Defendant. :
-----------------------------------------------------------x

<u>Ramos, D.J.:</u>

   On January 28, 2014, a grand jury returned an indictment charging Kowan Turner with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  The charge arose from a December 11, 2013 home visit conducted by officers of the New York Police Department's 46th Precinct in connection with a reported domestic violence incident.  After a sequence of events that ultimately led to a search of Turner's basement apartment, the police discovered and seized three firearms and ammunition from a backpack found in his closet.

   Turner has moved to suppress the firearms and ammunition, arguing that the police did not have a valid warrant or lawful consent for the searches of the apartment and the backpack.  Turner has also moved to dismiss the indictment on the basis of allegedly false statements made by a police officer in the application for a search warrant that was issued for the apartment.  The government has opposed both motions, arguing that the searches and seizure of the firearms were made pursuant to valid third-party consent and disavowing any reliance on the allegedly false statements in the search warrant application.

   For the reasons discussed below, the defendant's motion to suppress is GRANTED and the defendant's motion to dismiss is DENIED.

## I. BACKGROUND

### a. Initial Interview of Erica McIntyre[1]

On the morning of December 11, 2013, Erica McIntyre arrived at the 46th Precinct in the Bronx to report that she had been the victim of an incident of domestic violence at the hands of her boyfriend Kowan Turner that allegedly occurred in his apartment on the night of December 9, 2013. McIntyre first met with Officer Bienvenido Mena of the Domestic Violence Unit and described the incident to him. This interview lasted about 10-15 minutes. Apr. 16, 2014 Tr. 87:22 (Mena). Mena testified that she told him that when she left the apartment that morning she was done with Turner.[2] Tr. 105:3 (Mena). McIntyre also told Mena that Turner had several guns in his apartment, so Mena referred the case to Officer Aliro Pellerano of the Anti-Crime Unit. Mar. 26, 2014 Tr. 13:9-12 (Pellerano).

At around 10:00 or 10:30 a.m., Pellerano, a member of the Anti-Crime Unit supervised by Sergeant Angel Gonzalez, questioned McIntyre concerning the firearms. Tr. 17:13-14 (Pellerano). The conversation lasted between 30 minutes and one hour. Tr. 17:3-4 (Pellerano). Pellerano's partners, Officers Michael Pomerantz and Cesar Gomez, were present throughout the interview. Sgt. Gonzalez joined the interview later. Tr. 17:9-11 (Pellerano).

---

[1] For the reasons stated below, the Court finds that the police reasonably concluded that Erica McIntyre had apparent authority to grant consent to search the defendant's apartment. Such a finding is necessarily premised on the perception of the officers. *See United States v. Sparks*, 287 F. App'x 918, 920 (2d Cir. 2008). Accordingly, unless otherwise stated, the recitation of facts is based on the *officers'* testimony of what McIntyre said at the time of the interview.

[2] McIntyre testified that she was living in a shelter in Brooklyn before Turner asked her to move in with him in September 2013, and that she slept in the apartment "[a]lmost every day" since then. Apr. 24, 2014 Tr. 323:6-10, 323:21 (McIntyre). According to McIntyre, Turner made her a copy of the apartment keys. Tr. 325:18 (McIntyre). McIntyre kept "a bag" of clothes in the apartment, and had access to the closet–which had a door—but "never went in there" because of the roaches in the closet. Tr. 325:3-4, 327:18-22 (McIntyre). McIntyre said she did not have keys to the apartment at the time of the interview because she had just returned them to Winfred Turner, the defendant's father and the superintendent of the building where the apartment is located, on her way to the precinct. Tr. 335:21-23 (McIntyre). McIntyre testified that she told the police she had no intention of returning to Turner's apartment and made her decision official by returning her set of keys. Tr. 421:23-422:10 (McIntyre).

Pellerano testified that McIntyre told the officers she had lived with Turner in the basement apartment at 2249 Morris Avenue in the Bronx for about two or three months. Tr. 44:1-2 (Pellerano). According to Pellerano, McIntyre said she had keys to the apartment but had returned them to Kowan Turner's father, Winfred Turner, on her way to the precinct.[3] Tr. 44:14-15 (Pellerano). Pellerano asked McIntyre about the color and location of the firearms, and about the last time she had seen the firearms. Tr. 14:15-17 (Pellerano). McIntyre told the police the firearms were located in a dark blue book bag inside the closet of Turner's apartment. Tr. 14:17-19 (Pellerano). McIntyre told the officers that there were four guns in total. Tr. 14:19-20 (Pellerano). Pellerano testified that McIntyre said that she had heard Turner talking with his friends in the apartment about a robbery that had recently occurred in Washington Heights. Tr. 15:19-16:3 (Pellerano). McIntyre also told the police that Turner had been handling the firearms on the night of December 9, 2013, and accidentally discharged a bullet that caused a hole in the bathroom floor. Tr. 16:7-9 (Pellerano).

Officer Gomez, who was present during the interview, testified that he could not recall how long McIntyre said she had been living in Turner's apartment, but that it had been longer than 30 days. Apr. 16, 2014 Tr. 11:14-15 (Gomez). According to Gomez, McIntyre stated that she had keys to the apartment but had given them to Winfred Turner. Tr. 11:21-23 (Gomez). Gomez did not remember whether McIntyre said that she had left any belongings in Turner's apartment. Tr. 12:1 (Gomez). Gomez stated that McIntyre informed the officers that the firearms were in Turner's custody and that he kept them in a black bag in the closet. Tr. 11:1, 9:15-17 (Gomez). According to Gomez, McIntyre told the police that Turner had used the guns to commit home invasions. Tr. 11:6-7 (Gomez). Gomez also recalled that McIntyre informed

---

[3] Winfred Turner is also a resident of the Morris Avenue building.

the officers that Turner "let a round go, he shot a round in the floor of the bathroom at one time."
Tr. 9:18-19 (Gomez).

Officer Pomerantz, also present during the interview, testified that he questioned
McIntyre "at length" about her living arrangements "because [he] wanted to make sure that she
had like legal right to the apartment, like she had, you know, that she was actually living there."
Apr. 16, 2014 Tr. 232:17-20 (Pomerantz).  Specifically, according to Pomerantz, McIntyre
informed the officers that she had been living in Turner's apartment for three or four months, and
that she had been living in a shelter or halfway house before moving in with Turner.  Tr. 231:5-8,
282:1-3 (Pomerantz).  McIntyre described Turner's apartment as located in the basement of the
Morris Avenue building and consisting of an open area with a bathroom and a closet.  Tr.
231:13-14 (Pomerantz).  Pomerantz testified that McIntyre told the officers that she used the
shower in Winfred Turner's apartment almost daily because there was no working shower in the
basement.  Tr. 232:20-24 (Pomerantz).  Pomerantz recalled that McIntyre said she had a key to
the apartment but had given it to Winfred Turner that morning.  Tr. 231:17-19 (Pomerantz).
McIntyre informed the officers that she still had "clothes and some personal items" in the
apartment.  Tr. 231:22-23 (Pomerantz).

According to Pomerantz, McIntyre said she had seen guns in a backpack that was kept in
the closet of Turner's apartment.  Tr. 277:1-2 (Pomerantz).  Pomerantz testified that the officers
asked McIntyre "what she observed about the guns, how many guns there were, what their
location was, why she had reason to believe that they were real firearms and not . . . imitation
guns."  Tr. 229:8-11 (Pomerantz).  McIntyre told the officers that there were three or four guns,
described them as "one larger revolver, and other pistols," and that they were kept in a black
backpack.  Tr. 229:13-18 (Pomerantz).  McIntyre "said specifically that [the guns] did not belong

to her." Tr. 285:10 (Pomerantz).  Pomerantz recalled that she told the officers that Turner had

used the guns in robberies or home invasions.  Tr. 229:25-230:3 (Pomerantz).  McIntyre also told

the police that Turner had discharged one of the guns inside the bathroom in his apartment.  Tr.

301:25 (Pomerantz).

Pellerano testified that McIntyre appeared to be very scared during the interview.  "From

what I got from her, . . . she was scared about what she was telling us, for the information that

she was providing to us.  And she was scared of the defendant."  Tr. 16:18-21 (Pellerano).  While

McIntyre told the officers that Turner strangled her during an argument, Pellerano acknowledged

that he did not check if she had any bruises or marks.  Tr. 16:24-25, 44:21-22 (Pellerano).[4]

Pomerantz similarly testified that he did not remember observing any physical injury and that he

did not remember how she looked.  Tr. 301:15, 301:20 (Pomerantz).  Sgt. Gonzalez never asked

the officers about any possible bruising.  Apr. 16, 2014 Tr. 151:24 (Gonzalez).

In sum, at the time of the interview, the officers testified that McIntyre had been living

with Turner until that morning for approximately the previous three months; had keys to the

apartment but had relinquished them that morning to Winfred Turner; showered almost daily in

Winfred Turner's apartment; and left behind "clothes and some personal items" in Kowan

Turner's apartment.  Tr. 44:1-2, 44:14-15 (Pellerano); Tr. 232:20-24, 231:22-23 (Pomerantz).

As regards the guns, McIntyre informed the officers that:

- Turner kept three or four firearms in a backpack in his closet, Tr. 229:13-18 (Pomerantz); Tr. 9:15-17 (Gomez);

- The guns were in Turner's custody, Tr. 11:1 (Gomez);

- The guns did not belong to her, Tr. 285:10 (Pomerantz); and

---

[4] Mena, an officer assigned to the Domestic Violence Unit, testified that he had received training in identifying signs of injury, and that McIntyre did not have any visible injuries.  Tr. 110:7, 88:12 (Mena).

- Turner had recently discharged one of the firearms in the bathroom of his apartment, causing a hole in the bathroom floor, Tr. 16:7-9 (Pellerano).

Despite the fact that Pomerantz said he explained the consent form to McIntyre "[i]n great detail" and discussed her living arrangements "at length," McIntyre did not say, or was not asked, whether she had any identification or other document confirming her residence in Turner's apartment; whether she paid rent or was on the lease of the apartment; whether she received mail at Turner's address; whether she had a key to the front door of the apartment building; or whether she kept any papers or documents at the apartment. Tr. 280:4-21, 280:25-281:5, 286:11, 232:17 (Pomerantz); Tr. 43:17 (Pellerano); Tr. 11:18 (Gomez). There was no testimony from the officers about whether McIntyre asked the police to accompany her back to the apartment to retrieve any belongings, or about whether McIntyre told the police that she had any means of accessing the apartment. With respect to the guns, McIntyre did not tell the officers, or was not asked, whether she kept any personal items in the closet;[5] or whether she kept any of her own belongings in the backpack containing the guns. Tr. 174:20 (Gonzalez); Tr. 285:17, 285:12-14 (Pomerantz).

b. *Execution of McIntyre's Consent to Search*

At the conclusion of the interview the officers testified that McIntyre agreed to sign a written consent to search Kowan Turner's apartment. The accounts of the four Anti-Crime Unit officers differ as to McIntyre's signing of a consent form.

According to Pomerantz, he personally printed the consent forms, filled out the description of the locations to be searched and McIntyre's personal information, and then asked her to read and sign the forms. Tr. 234:1-9 (Pomerantz). Pomerantz spent "several minutes" explaining the consent form to McIntyre "[i]n great detail," and testified that McIntyre indicated

---

[5] If the officers had asked her, she presumably would have told them that she never went inside, much less used, the closet because of the roach infestation.

that she understood what she was being asked to consent to and did not express any reservations about signing the form.  Tr. 237:4, 286:11, 237:5-9 (Pomerantz).[6]  In contrast with the other officers' testimony, Pomerantz testified that McIntyre signed two consent forms, one for Kowan Turner's apartment and another for Winfred Turner's apartment.  Tr. 234:13-14 (Pomerantz).  Each form indicated that she gave consent to search the entirety of the two apartments.  Tr. 236:2-6, 236:18-25 (Pomerantz).  Pomerantz further testified that he made "several copies" of the forms.  Tr. 237:19 (Pomerantz).  He provided one or two copies to Pellerano, placed one extra copy on a filing cabinet in the office, and gave a copy of each consent form to McIntyre.  Tr. 237:19-238:2 (Pomerantz).  Ironically, Pomerantz testified that he made the extra copy and placed it on the filing cabinet "just in case something happened, because paperwork tends to go missing."  Tr. 237:23-24 (Pomerantz).  Pomerantz provided McIntyre with one copy of each form because she requested a copy, and he testified that he was "not sure what the policy is [on providing copies to third parties], but [he] didn't see any harm in giving it to her."[7]  Tr. 237:25-238:2 (Pomerantz).  Pomerantz testified that he provided the copies to Pellerano because Pellerano was the arresting officer.  Tr. 294:2-6 (Pomerantz).

Pellerano testified that, at some point in the interview, he left the room, and it was apparently during this time that Pomerantz asked McIntyre to sign a consent form.  Tr. 45:12-17 (Pellerano).  Accordingly, Pellerano, did not witness McIntyre sign the form.  Tr. 45:18-23 (Pellerano).  Pellerano testified that Pomerantz subsequently showed him the consent form— which was in Pomerantz's hand—on the way out of the 46th Precinct to Turner's apartment.  Tr.

---

[6] With respect to the consent forms, McIntyre testified on direct examination that the officers "didn't really explain anything.  They just showed me two pieces of paper, and I signed them."  Tr. 337:18-19 (McIntyre).  McIntyre then testified on cross examination that "it was explained to me that one [of the forms] was for [Winfred Turner's apartment], for access to the police, and one was for the basement.  So that's why I signed them."  Tr. 482:14-16 (McIntyre).

[7] McIntyre testified that the officers told her she could not have a copy of the form, and that "their copy I accidentally took by accident."  Tr. 485:8-9 (McIntyre).

54:3-6 (Pellerano).  Pellerano said that Pomerantz told him he had left a copy of the form on a desk in the precinct, but that Pomerantz never handed him a copy.  Tr. 533:8-22 (Pellerano).

Though Gomez was present throughout the interview, he could not recall whether it was Pomerantz or Pellerano who asked McIntyre to sign the form.  Tr. 12:14-15 (Gomez).  Gomez testified that he witnessed McIntyre sign the consent and that he saw the form afterward.  Tr. 38:8-11 (Gomez).  According to Gomez, McIntyre signed only one consent form.  Tr. 38:14 (Gomez).  Gomez recalled that the police provided McIntyre with a copy of the consent form and retained a copy for the precinct.  Tr. 13:12-13 (Gomez).

Sgt. Gonzalez stated that he "probably did see the form," which actually requires a supervisor's signature.[8]  Tr. 139:25 (Gonzalez).  Sgt. Gonzalez further stated that he did not see anyone give McIntyre a consent form or copying a consent, and did not remember reading the form.  Tr. 155:1-9 (Gonzalez).  Sgt. Gonzalez had "no idea" how many consent forms McIntyre supposedly signed.  Tr. 156:5 (Gonzalez).

However many copies of the forms there once may have been, the government now concedes that none presently exist.[9]  Both the police and McIntyre now assert that they are unable to locate their copies.  Pellerano testified that Pomerantz told him at some point that he no longer had the consent form.  Tr. 55:4 (Pellerano).  According to Pellerano, he could not "recall

---

[8] Similarly, and despite the fact that his memory of the execution of the consent form is the most complete of any officer present and that the forms explicitly require a supervisor's signature (Gov. Ex. 9), Pomerantz could not recall with certainty whether Sgt. Gonzalez signed the consent.  Tr. 244:23-25 (Pomerantz).

[9] Neither the police reports and contemporaneous notes produced by the government, nor the documents related to the Office of the Bronx County District Attorney's prosecution of Turner for the alleged assault on McIntyre, reflect McIntyre's signing a consent form for either Kowan Turner's or Winfred Turner's apartment.  (Gov. Exs. 5, 6; Def. Ex. D)  Pellerano testified that he did not recall mentioning McIntyre during his grand jury testimony, let alone referencing the consent she supposedly provided the officers.  Tr. 540:7-19 (Pellerano).  NYPD Detective Edgardo Barbot, an investigator with the U.S. Attorney's Office assigned to this prosecution, testified that there was no mention of McIntyre's written consent in the government's notes from its initial interviews of Pomerantz and Pellerano on December 16, 2013, although Det. Barbot admitted that would have been an important fact.  Apr. 28, 2014 Tr. 560:23, 559:13, 558:9 (Barbot).  The officers' testimony did not provide any explanation why the contemporaneous notes and reports do not reflect the fact that McIntyre had provided written consent.

the exact time, but one of the days that I needed it, we couldn't find it." Tr. 55:6-7 (Pellerano).
"This happened after the arrest. I'm not sure about the date of when we were looking for it." Tr.
56:2-3 (Pellerano). Pomerantz testified that "Pellerano informed me that he didn't have it or
maybe -- I'm pretty sure that's the way I found out." Tr. 294:22-24 (Pomerantz). The officers
have been unable to locate either the original consent form or any copy. McIntyre's copy
suffered a similarly mysterious fate: "I had the copies, but because I was homeless, I lost them.
I lost them in the process of me being homeless. It wasn't done intentionally." Tr. 339:3-5
(McIntyre).

### c. *Encounter of Winfred Turner*

After Pellerano spoke with Sgt. Gonzalez, the officers decided to do a "home visit" with
a domestic violence officer at Turner's residence at 2249 Morris Avenue, which took place
between 11:00 and 11:30 a.m. on December 11, 2013. Tr. 18:2-5, 18:18-19 (Pellerano). While
each of the officers referred to it as a "home visit," they acknowledged that the purpose of the
visit was to arrest Turner and seize the guns. According to Sgt. Gonzalez, the police were going
to arrest Turner "for the domestic [violence incident] with other things in mind." Tr. 137:10-11
(Gonzalez). Pomerantz similarly testified that he believed he had a "professional police
responsibility to recover the guns in Mr. Turner's apartment." Tr. 298:7-8 (Pomerantz).

The four members of the Anti-Crime Unit, Sgt. Gonzalez, Pellerano, Gomez, and
Pomerantz, and Officer Mena of the Domestic Violence Unit all went to 2249 Morris Avenue.
Tr. 19:6-7 (Pellerano). Despite allegedly having written consent, the officers did not first go to
Turner's basement apartment. Instead, they gained access to Turner's residence through the
superintendent, Winfred Turner. Tr. 18:24 (Pellerano). Here again, the accounts of the officers
differ.

According to Pellerano, he and Gomez found Winfred Turner on the first floor and asked him to let them into the basement apartment. Tr. 18:24-19:3 (Pellerano). The police did not tell Winfred Turner that McIntyre had provided written consent to enter the apartment. Tr. 48:15 (Pellerano). Pellerano testified that, after the officers told Winfred Turner that they needed to talk to his son, Winfred Turner agreed to get the key and open the door to his son's apartment. Tr. 48:25-49:9 (Pellerano). Gomez testified that he and Pellerano went to the lobby, "ran into the super," and asked for the keys to Kowan Turner's apartment. Tr. 15:20-23 (Gomez).

In contrast, Sgt. Gonzalez stated that the officers first attempted entry into Turner's apartment, and then Gomez alone went to find Winfred Turner when they were unable to enter. Tr. 140:5-7 (Gonzalez). In any event, these accounts are contradicted by Winfred Turner's testimony.

According to Winfred Turner, two police officers came to his door and said they needed to speak to his son in connection with a domestic violence case. Mar. 26, 2014 Tr. 106:14-16 (W. Turner). He told the police that his son was not currently present in his apartment. Tr. 106:18-19 (W. Turner). After one officer told Winfred Turner they knew McIntyre had left him a key to the apartment, the police said they wanted Winfred Turner to take them to his son's apartment. Tr. 106:19-22 (W. Turner). He objected. Tr. 106:24-107:5 (W. Turner). "Then the officer said something about calling the job," which Winfred Turner understood to mean that they would call his employer, the landlord.[10] Tr. 107:5-6 (W. Turner). This led him to change his mind because, as the super, he is "not supposed to let anybody stay in the basement or

---

[10] The officers disputed Winfred Turner's claim about the threat. Gomez testified that the officers did not threaten Winfred Turner "at all," and that "[w]e don't do that. We don't deal with housing issues, so we wouldn't do that." Tr. 16:14, 46:20-21 (Gomez). Pellerano stated that Winfred Turner "had no objection to giving us the key," and that he "personally didn't never say" anything to Winfred Turner about reporting the illegal apartment. Tr. 49:3, 49:14 (Pellerano). Pellerano clarified that he "was right behind [Gomez]" when they went to speak with Winfred Turner. Tr. 49:23 (Pellerano). Sgt. Gonzalez similarly recalled that there were no threats made, that Winfred Turner assisted the police "on his own, willingly." Tr. 141:1 (Gonzalez).

anything like that. . . . I probably could have lost my job." Tr. 107:10-12 (W. Turner).  Mr.

Turner went downstairs with approximately four police officers and let them inside the

apartment.  Tr. 107:17-19 (W. Turner).[11]

> d.  *Entry into Kowan Turner's Apartment*

Upon entry into the defendant's basement apartment, Pellerano testified that he observed

a bed directly in front of him.  Tr. 19:15-16 (Pellerano).  The defendant was asleep on the bed.

Tr. 19:22 (Pellerano).  There was a bathroom to the left of the bed and open space to the right.

Tr. 19:16-18 (Pellerano).  The closet was located on the far right of the door upon entry.  Tr.

19:19 (Pellerano).  Pellerano was able to see what appeared to be a bullet hole in the floor of the

bathroom and informed his colleagues.  Tr. 20:3-5 (Pellerano); Tr. 28:18-20 (Gomez).

According to Sgt. Gonzalez, the hole in the floor lent credibility to McIntyre's account.  Tr.

141:18-21 (Gonzalez); Tr. 57:4-12 (Pellerano).

Turner was immediately arrested on the domestic violence charge after the officers

entered the apartment.  Tr. 23:14 (Pellerano).  According to Mena, "[t]he other officers that I was

with approached the bed, put him in cuffs, [and] passed him to me."  Tr. 96:13-15 (Mena).  The

officers uniformly testified that, despite the inherent dangerousness of the situation—surprise

entry into the apartment of an individual reported to possess firearms and carry out armed

robberies with others—the police did not perform a protective sweep of the premises.  Tr. 72:1-2

---

[11] According to the federal complaint, the government learned in a "subsequent conversation" with McIntyre that "the Superintendent (1) permitted [Kowan Turner] to reside in the basement area without paying rent, (2) had keys to the area, and (3) frequently entered the area without [Kowan Turner's] foreknowledge or express permission." Compl. ¶ 4 n.1.  However, the officers did not provide testimony regarding any statements McIntyre made relating to Winfred Turner's authority to consent to the search of his son's apartment.  Indeed, Mena testified that there was no discussion among the officers prior to their arrival at the building regarding whether Winfred Turner had such authority.  Tr. 121:19 (Mena).

Winfred Turner testified that he accessed the basement on a daily basis in connection with his responsibilities as superintendent.  Mar. 26, 2014 Tr. 622:6-10 (W. Turner).  Winfred Turner stated that, as part of his daily duties, he "go[es] through the door with the garbage area . . . where I sit down and I take . . . TVs and stuff like that."  Tr. 622:7-10 (W. Turner).  He went into his son's apartment "[o]nly if [he] had to use the bathroom," which was "[n]ot often."  Tr. 622:14-16 (W. Turner).

(Gomez).  In addition, despite the fact that they purportedly had in their possession what they believed to be valid written consent to search the entire apartment, and their stated intent to arrest Turner and seize the guns, each of the officers testified that they made no effort whatsoever to look in the closet or search for the firearms when they first entered Turner's apartment.  Tr. 52:21-53:8 (Pellerano); Tr. 246:22-247:1 (Pomerantz); Tr. 20:13 (Gomez); Tr. 144:5 (Gonzalez). Winfred Turner offered a substantively different account.

Winfred Turner testified that he accompanied the officers into his son's apartment upon their initial entry and walked over to Kowan Turner's bed, woke him up, and asked him, "What did you do?"  Tr. 107:25-108:1 (W. Turner).  According to Winfred Turner, one officer immediately "went to the closet and started searching the closet.  Then he pulled out a bag and when he brought the bag out, he told me I had to step out."  Tr. 108:3-5 (W. Turner).

    *e.  Decision to Obtain a Search Warrant*

The Anti-Crime officers testified that it was Sgt. Gonzalez's idea to obtain a search warrant instead of relying on McIntyre's consent.  Pellerano testified that "right after" he spoke with Sgt. Gonzalez about the bullet hole, Sgt. Gonzalez said, "You know what?  Let's freeze the apartment.  Let's get a search warrant."  Tr. 58:19-20 (Pellerano).   According to Pellerano, there was little deliberation among the officers originally on the scene regarding the decision to obtain the warrant: "I didn't hear nobody talking about it.  I just-- my supervisor was going to get a search warrant and that was the end of it."  Tr. 40:13-15 (Pellerano).

Pomerantz similarly testified that "Sergeant Gonzalez . . . made the decision to freeze the apartment, so we froze the apartment.  I believe that decision was made when he was still there, but I'm not hundred percent sure."  Tr. 244:3-6 (Pomerantz).  However, according to Pomerantz, he argued against obtaining a warrant because in his opinion McIntyre's consent was sufficient

to conduct a search, and a warrant was therefore unnecessary.  He was overruled by Sgt.
Gonzalez.  Tr. 244:9-20 (Pomerantz).

Gomez supported Pomerantz's version of events.  Gomez testified that, as soon as
Pellerano saw the hole in the bathroom, the officers had a discussion with Sgt. Gonzalez in
which the officers shared their belief that they "had enough to search the apartment due to the
fact that we had a consent to search.  But the sergeant overrid [*sic*] us and said, no, we had to get
a search warrant."  Tr. 21:7-12 (Gomez).  According to Gomez, it was at that time that Sgt.
Gonzalez "basically told us to freeze the apartment, nobody touches anything, just leave it alone
until we get a search warrant."  Tr. 21:20-22 (Gomez).  It was "[a] hundred percent" Sgt.
Gonzalez's decision to obtain the search warrant and freeze the apartment.  Tr. 56:17-18
(Gomez).  The officers testified that they did not search the apartment until later, when a search
warrant was obtained.  Tr. 70:17 (Gomez).

Sgt. Gonzalez shared a slightly different account.  Despite McIntyre's purported consent,
Sgt. Gonzalez testified that he believed it would be a stronger case if they were able to rely on
both consent and a warrant.  Tr. 143:5-6 (Gonzalez).  While Sgt. Gonzalez admitted that the
decision to obtain a search warrant was not based on any new facts learned in the course of the
initial entry, he testified that, "[o]nce I determined that other factors was [*sic*] in the apartment, I
told people, my officers, to stop and go back to the precinct to confer with my commanding
officer in regards to obtaining a search warrant."  Tr. 177:15-19, 169:1-4 (Gonzalez).

Sgt. Gonzalez returned to the precinct to speak with his supervisor, Deputy Inspector
John Hart, about the domestic violence incident, the officers' entry into the apartment, and the
purported presence of firearms.  Tr. 145:15-19, 146:2 (Gonzalez).  Deputy Inspector Hart then
requested to speak with Sergeant Frank Bohr, the 46th Precinct's Field Intelligence Officer,

about obtaining a search warrant.  Tr. 146:5-10 (Gonzalez).  Sgt. Gonzalez returned to Turner's apartment building to wait for the warrant with Pellerano and Pomerantz.  Tr. 147:2-4 (Gonzalez).

Sgt. Bohr's account differs from that of the officers of the Anti-Crime Unit.  Sgt. Bohr testified that Deputy Inspector Hart informed him of the case while they were at the precinct.  Apr. 16, 2014 Tr. 184:23-185:5 (Bohr).  After Sgt. Gonzalez told Sgt. Bohr the facts of the case, Sgt. Bohr went to Turner's building.  Tr. 185:7-15 (Bohr).  According to Sgt. Bohr, after arriving on the scene and speaking with Sgt. Gonzalez, he "wasn't sure if [McIntyre] could give consent," but acknowledged that she may not have had sufficient control of the apartment to provide valid consent.  Tr. 220:5, 220:14-18 (Bohr).  Sgt. Bohr recalled that he then "discussed that, you know, that we should get a search warrant, it is the best way to go with this."  Tr. 187:11-12 (Bohr).  Sgt. Bohr based this opinion on his experience, that "in the past I felt it is always best to have a search warrant . . . ."  Tr. 187:14-15 (Bohr).  Sgt. Bohr testified that it was his idea to propose the search warrant, and that Sgt. Gonzalez agreed with him.  Tr. 218:18-21 (Bohr).

### f.   Officer Valentino's Application  for a Warrant

Officer Damon Valentino, the 46th Precinct's Assistant Field Intelligence Officer, was the person tasked with applying for the search warrant.  However, as the Anti-Crime Unit officers testified, Valentino was not on the scene upon the initial entry into Kowan Turner's apartment, and none of them ever discussed the facts of the case with Valentino.  Tr. 43:16-17 (Gomez); Tr. 170:3-15, 179:23-180:1 (Gonzalez).  Sgt. Gonzalez testified that he did not speak with Valentino directly even though he was the supervising officer on the case.  Tr. 170:7-13 (Gonzalez).  Gomez stated his understanding that the search warrant and the affidavit were based solely on what Valentino knew.  Tr. 61:25 (Gomez).

14

Sgt. Bohr testified that he instructed Valentino at Turner's apartment to go to court and obtain the search warrant.  Tr. 188:10-11 (Bohr).  His testimony concerning his dealings with Officer Valentino was inconsistent, however.  Sgt. Bohr first stated on direct examination that he did not speak with Valentino about the information he should include in the application.  Tr. 188:24-189:1 (Bohr).  When questioned further by the Court, Sgt. Bohr said he could not recall whether he had such a conversation:  "I don't recall that, the exact facts, what we discussed."  Tr. 194:1-2 (Bohr).  In response to the Court's question about where Valentino would have obtained the facts for the warrant, Sgt. Bohr stated, "I found out later on that it was for drugs in the apartment."  Tr. 194:11-12 (Bohr).  Then on cross-examination, Sgt. Bohr testified that he shared with Valentino the information the Anti-Crime Unit had passed on to him:  "what the facts of the case are, what we had, and I would like to get a search warrant."  Tr. 211:10-11 (Bohr).

In his affidavit, Valentino swore, in part, that he personally knocked on the door of Turner's apartment on the morning of December 11, 2013, to investigate an assault.  Valentino Aff. ¶ 3.  According to the affidavit, after Turner answered the door, Valentino was able to observe "a lit, burning, cigarette emitting a distinctive odor, that deponent believed based on his training and experience to be marijuana," on an ashtray in the apartment.  *Id.*  After entering the apartment to place Turner under arrest, Valentino identified "a quantity of a white powdery substance" next to plastic bags, which he believed to be cocaine.  *Id.*  According to the affidavit, Valentino confirmed that the substance was cocaine.  *Id.*

The foregoing facts sworn to by Valentino are not supported by the evidence or testimony presented at the hearing of this matter.[12]  The government has affirmatively disavowed any

---

[12] The only statement in Valentino's affidavit that is consistent with the accounts of the other officers regards the discovery of plastic bags typically used for drug packaging.  According to Valentino's affidavit, he "observed . . . on a stove inside the subject premises numerous multi-colored plastic bags that deponent believes . . . are used for the packaging of controlled substances."  Valentino Aff. ¶ 3.  Gomez testified that the officers found on top of the stove

reliance on the affidavit sworn to by Valentino, who has been referred for investigation to the

Internal Affairs Bureau.  *See* Letter of AUSA Andrew J. DeFilippis, dated March 24, 2014 at 1-

2; Tr. 171:23 (Gonzalez).

   g.  *Execution of the Warrant*

   Hours after first entering the apartment, between 3:00 and 4:00 p.m., the officers were

told they had a search warrant for the apartment.  Tr. 24:14 (Pellerano); Tr. 148:19-20

(Gonzalez).[13]  Sgt. Gonzalez did not provide his team with instructions or plans for the search.

Tr. 133:3-9 (Mena).  There were no specific assignments.  Tr. 164:25 (Gonzalez).[14]

   According to Gomez, "Once the search warrant was issued, we split up."  Tr. 25:14

(Gomez).  He went straight to the closet, noticed bags full of fake jewelry and the backpack

described by McIntyre in the middle shelf of the closet.  Tr. 25:16-17 (Gomez).  He then picked

up the backpack and opened it.  Tr. 25:15-18 (Gomez).

   Pellerano testified that Gomez went into the closet and recovered the backpack.  Tr. 25:5-

6 (Pellerano).  Gomez walked out of the closet and emptied the bag on top of the stove.  Tr. 25:5-

6 (Pellerano).  Pellerano was then able to see three guns and ammunition.  Tr. 25:6 (Pellerano).

Two of the guns were loaded.  Tr. 28:8-13 (Pellerano).

---

"little baggies that they put the crack cocaine inside," which Gomez referred to as "drug packaging."  Tr. 18:2-3, 54:5-6 (Gomez).  The bags were admitted into evidence during the suppression hearing.  (Gov. Ex. 11)

[13] The officers could not say for certain whether Valentino told them in person that he had secured the search warrant.  The officers also could not recall whether Valentino was present in Turner's apartment after the warrant was obtained.  Tr. 117:3-4 (Mena); Tr. 172:17-173:5 (Gonzalez).

[14] Certain officers testified that they either did not receive or did not remember training on how to obtain and execute warrants.  Gomez testified that he was never trained, or did not remember any training, on how to obtain a search warrant.  Tr. 64:20-21, 65:7 (Gomez).  Mena said that he had never received training on how to conduct a search or been an affiant with respect to an application for a search warrant.  Tr. 132:12-18 (Mena).  In fact, Mena testified that he had never assisted in executing a search warrant before the December 11, 2013 search of Turner's apartment, though he did not disclose this to the members of the Anti-Crime Unit.  Tr. 132:19-24 (Mena).  Sgt. Gonzalez testified that he attends "[d]efinitely two" yearly trainings, which concern "shoot[ing] with my service revolver."  Tr. 179:5-9 (Gonzalez).  When questioned regarding whether he had received training on executing arrest warrants, Sgt. Gonzalez stated, "They probably do, I just -- sometimes other training comes into my head."  Tr. 179:12-13 (Gonzalez).

The only items the officers recalled seeing at the apartment that arguably belonged to McIntyre were a pair of cut-off jeans that appeared to belong to a woman and "female shoes next to the bed."[15]  Tr. 68:22-23 (Pellerano); Tr. 52:15-16 (Gomez).  The jeans were found to the right of the bed.  Tr. 69:9 (Pellerano).

*h.  The Defendant's Affirmation*[16]

McIntyre's account of her relationship with Turner and the apartment is rebutted by the affirmation submitted by the defendant in support of his motion to suppress the guns.  According to Turner, he has lived at the Morris Avenue building his entire life.  Turner Aff. ¶ 3.  He started living in the basement in December 2012.  *Id.* ¶ 4.  Turner had a set of keys to the apartment, and no one else was permitted in the apartment without his permission.  *Id.*  Turner and McIntyre did not have a legal relationship and did not share any living expenses.  *Id.* ¶ 10.  McIntyre stayed overnight at his apartment on "a number of occasions" between November 2013 and December 11, 2013.  *Id.* ¶ 6.  McIntyre did not keep her possessions at the apartment but did bring a change of clothes when she stayed there.  *Id.* ¶ 7.  She did not have her own set of keys, and did not have a right to be in the apartment unless Turner invited her to stay there.  *Id.* ¶¶ 8, 11.  Turner kept the seized guns in his closed backpack inside a closet.  *Id.* ¶ 12.  McIntyre never used the backpack and had no right to open it.  *Id.*

**Procedural History**

Presently before the Court are Defendant Kowan Turner's motions to suppress the firearms and ammunition found in the December 11, 2013 search of his apartment and to dismiss the federal indictment.  A bail hearing was held on March 26, 2014, at which Officer Pellerano

---

[15] Pellerano did not recall seeing women's shoes in Turner's apartment; instead, he testified that he "observed shoes that belonged to a kid, like young kid, children."  Tr. 66:15-16 (Pellerano).

[16] While the defendant submitted an affirmation in support of his motion to suppress, he did not testify at the suppression hearing.

and Winfred Turner testified.  A suppression hearing was held before the Court on April 16,

2014; April 24, 2014; and April 28, 2014.  The government has disclaimed reliance on the search

warrant obtained by Officer Valentino and relies primarily on the consent provided by Erica

McIntyre.  Accordingly, the Court will consider whether Erica McIntyre or Winfred Turner had

actual or apparent authority to consent to the search.[17]

## II.  DEFENDANT'S MOTION TO SUPPRESS

The Fourth Amendment protects individuals in their homes against unreasonable searches

and seizures.  A warrantless search is *per se* unreasonable under the Fourth Amendment, unless

the search can be justified by one of the narrowly drawn exceptions to the warrant requirement.

*See, e.g.*, *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253 (1958); *United States v.*

*Gonzalez Athehorta*, 729 F. Supp. 248, 258 (E.D.N.Y. 1990); *see also Steagald v. United States*,

451 U.S. 204, 211, 101 S. Ct. 1642 (1981) ("Except in . . . special situations, we have

consistently held that the entry into a home to conduct a search or make an arrest is unreasonable

under the Fourth Amendment unless done pursuant to a warrant.").  As established in *United*

*States v. Matlock*, 415 U.S. 164, 165-66, 94 S. Ct. 988 (1974), one such exception pertains to

"search[es] of property, without warrant and without probable cause, but with proper consent

voluntarily given."  *See also United States v. Alberts*, 721 F.2d 636, 638 (8th Cir. 1983)

---

[17] The defendant contends that the officers can no longer rely on third-party consent because the officers sought and thereafter relied on the search warrant.  Apr. 28, 2014 Tr. 633:19-634:1 (Gombiner).  The Court disagrees.  *United States v. Veras*, No. 97 CR. 526 (LMM), 1998 WL 66010, at *3 (S.D.N.Y. Feb. 18, 1998) ("The Court . . . does not perceive that an attempt by law enforcement officers to identify more than one valid basis for a search invalidates either basis, if valid.  The reasonableness of a search, in any event, does not turn on a law enforcement officer's subjective belief in that regard.  The standard is one of objective reasonableness."); *United States v. Adames*, 485 F. Supp. 965, 972 n.5 (E.D.N.Y. 1980) ("It should be noted at this point that our finding of the sufficiency of the warrant and the underlying affidavit suggests an alternative ground for the admissibility of the evidence gained pursuant to the earlier consent searches . . . ."); *United States v. Gearhart*, 326 F.2d 412, 414 (4th Cir. 1964) ("The officers [who sought warrants when an alternative basis for the search existed] underestimated their legal authority, and while they were mistaken in their opinion as to the applicable law, their conduct was entirely lawful.  The warrants did not enlarge the officers' authority nor did they diminish it . . . ."); *Rocha v. United States*, 387 F.2d 1019, 1022 (9th Cir. 1967), *cert. denied*, 390 U.S. 1004, 88 S. Ct. 1247 (1968) (officers found not to have "elected" to proceed on the basis of an invalid warrant alone where probable cause to arrest also existed).

("Limited exceptions to this warrant requirement include voluntary consent to the search . . . .").

In light of these considerations, the Supreme Court has noted that the consent doctrine is

intended to function as a "jealously and carefully drawn exception" to the warrant requirement.

*Georgia v. Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515 (2006) (internal quotation marks and

citation omitted).

Here, the government relies primarily on the consent of Erica McIntyre to validate the

warrantless search of the apartment and backpack.  In order to validate the searches based on

McIntyre's consent, the government must demonstrate that McIntyre had actual or apparent

authority over both Turner's apartment and the backpack.  Actual authority "to consent to a

search rests on mutual use of the property by persons generally having joint access or control for

most purposes . . . ." *United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009) (internal

quotation marks and citation omitted).  Even if the third party providing consent in fact lacked

such authority, apparent authority can "nonetheless validate the search if the person reasonably

appeared to the police to possess authority to consent to the search." *Id.*; *see also United States

v. Wilburn*, Cr. No. 11-15-GFVT, 2012 WL 1658678, at *2 (E.D. Ky. May 11, 2012) ("Actual

authority is present when the consenter has actual rights in the object; the focus in this analysis is

on the consenter.  Apparent authority, on the other hand, is present when officers could

reasonably perceive that the consenter had such rights; the focus is on the officers' perception.").

### a.  Erica McIntyre's Actual Authority to Consent to the Apartment Search

The Second Circuit has held that a third party has authority to consent to a search of a

home when that person (1) has access to the area searched and (2) has either (a) common

authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to

the area.  *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992).  "[N]o case in this circuit has

delimited the requisite 'access' necessary to satisfy the first prong of the *Davis* test." *Moore v. Andreno*, 505 F.3d 203, 210 (2d Cir. 2007) (internal quotation marks and citation omitted). However, courts in this Circuit have held that a third party's possession of keys supports a finding of access. *See, e.g.*, *United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir. 1981), *cert. denied*, 454 U.S. 830, 102 S. Ct. 126 (1981) ("[B]oth Macris and Jolly had keys to the defendant's laboratory, thus satisfying the access requirement . . . ."). Indeed, in a case involving the estranged wife of a defendant who had left the marital home two weeks earlier, the Second Circuit found that she had actual authority to consent to a search of the home based at least in part on the fact that she still possessed a key. *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988). Likewise, the fact that a third party does not have keys to the premises to be searched has been found to be suggestive of a lack of actual authority to consent to a search of those premises. *See United States v. Wright*, No. 10-cr-504-S-1 (ADS)(ARL), 2012 WL 1132421, at *3 (E.D.N.Y. Apr. 2, 2012) ("If in fact the [confidential witness] did not possess the key to the Subject Premises or the alarm code, the Court would likely find that [he] did not possess actual authority to consent to a search of the Subject Premises because he would not have had actual access to the residence.").

With respect to the second prong of the *Davis* test, courts have considered whether the person providing consent had "any real measure of control over" the area searched. *Moore*, 505 F.3d at 210. Here, the Court cannot state with confidence that Ms. McIntyre had *any* measure of control over the apartment. The officers were plainly on notice that she had relinquished her keys to the apartment and disavowed any further relationship with the defendant as of the day of the search. Thus, the issue of whether McIntyre could enter the apartment without the defendant's acquiescence was self-evident. Moreover, despite ample opportunity to explore with

Ms. McIntyre what connection with the apartment she may yet have retained, the officers failed to establish whether she ever intended to return to the apartment or had any remaining control over the apartment or its contents.  However, because the Court finds that the officers could reasonably have concluded that McIntyre had apparent authority to consent to the search of the apartment, we need not decide whether she had actual authority over Turner's apartment.

     *b.  Erica McIntyre's Apparent Authority to Consent to the Apartment Search*

     Though it is a close question, the Court finds that the facts available to the officers would "warrant a man of reasonable caution in the belief that [McIntyre] had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1860 (1968) (internal quotation marks omitted)).  McIntyre told the officers that she and Turner dated for three months prior to the search and had lived together in the apartment for at least a substantial portion of that period.  Officers Pellerano, Gomez, Mena, and Pomerantz testified that McIntyre told them that, until the morning that she moved out, she even possessed a set of keys to the residence and returned them to Turner's father en route to the precinct.  Tr. 44:11-12 (Pellerano); 14:15-21 (Gomez); 105:6 (Mena); 231:17-19 (Pomerantz).  These basic facts could have led the police to reasonably conclude that McIntyre had authority to consent to the apartment search.  *Cf. United States v. Chavez*, No. CR 12-2060 JB, 2013 WL 1007727, at *33 (D.N.M. Mar. 6, 2013) (apparent authority found where third party told police he had been living in defendant's home for three or four months); *United States v. Weeks*, 442 F. App'x 447, 453 (11th Cir. 2011) (apparent authority in consent of girlfriend who had mutual use of defendant's apartment and shared a set of keys with defendant); *United States v. Bouie*, No. 1:08CR87DAK, 2010 WL 120015, at *7 (D. Utah Jan. 7, 2010) (apparent

authority in girlfriend's consent where she had lived in defendant's home and maintained a key to the residence but did not pay for rent).

This case is on a slightly different footing because, unlike the third parties in the foregoing cases who still lived in the premises, at the time of the search McIntyre had left the apartment and affirmatively disavowed to the officers any future intent to return.  The government argues that as a purported victim of domestic violence, however, McIntyre was essentially forced out; thus, the government contends that she should not be deemed to have relinquished her rights over the premises.

The Second Circuit has not specifically discussed whether a consenting party in McIntyre's position can provide consent under an apparent authority theory.[18]  The only case proffered by the parties or identified by the Court within this Circuit finding that a wife or girlfriend subjected to violence or threats of violence had apparent authority to consent to a search even after leaving the residence is *United States v. Stone*, No. 3:05cr281 (EBB), 2007 WL 2727532, at *5 (D. Conn. Sept. 18, 2007).  In that case, however, the district court found that a wife forced out of the marital home a week earlier also had actual authority to grant consent to search the marital residence.  *Id.*

There is, however, substantial support in cases outside the Second Circuit for the proposition that victims of domestic violence retain rights over property they are forced to flee. In a closely analogous case out of Kentucky, for example, the court found that a live-in girlfriend had apparent authority to consent to a search of the defendant's residence even though she had lived there for only "a period of months," did not have a key, and her name was not on the lease.

---

[18] The Second Circuit has ruled that wives and girlfriends can consent to search a home despite the fact that they have moved out of the premises where they have actual authority.  *See Trzaska*, 859 F.2d at 1120; *United States v. McGee*, 564 F.3d 136 (2d Cir. 2009) (live-in girlfriend had actual authority to consent to search of defendant's residence where the defendant took away her keys after she told him she planned on leaving him).

*United States v. Clay*, Cr. No. 13-15-GFVT, 2014 WL 657183, at *4 (E.D. Ky. Feb. 20, 2014).

The complainant in *Clay* told police that the defendant had assaulted her earlier that day, had

thrown her out of the house, and was keeping drugs and a gun inside a locked closet in his

apartment. *Id.* The court held the girlfriend's written consent to be valid for the apartment

search. *Id.* In so finding, the court noted that:

> There are no shortage of cases wherein a man accused of assaulting and expelling
> his live-in girlfriend found himself in federal court arguing that she did not have
> apparent authority to consent to a search of the dwelling where he kept his drugs
> and guns. Further, a survey of those cases reveal that [the defendant's]
> counterparts have found themselves in an uphill battle to make a showing that the
> women who they cohabitated with did not, in fact, have the apparent authority to
> consent to a search to the place from which they had been driven by their abusive
> boyfriends.

*Id.* at *2; *see also United States v. Meada*, 408 F.3d 14, 17, 21 (1st Cir. 2005) (apparent authority

in the consent of live-in girlfriend who requested the police's assistance in recovering her

belongings and her cat from defendant's apartment where she told police she had been living

there for two months, could enter in the defendant's absence, and that the defendant "had

recently been violent toward her"); *cf. United States v. Backus*, 349 F.3d 1298, 1303 (11th Cir.

2003) (actual authority in battered wife's consent to search home she had fled six months before

even though she could not physically access the home because her keys "opened the lower lock

on the door but not the deadbolt above it, which looked as though it had been recently

replaced"); *United States v. Brannan*, 898 F.2d 107, 108 (9th Cir. 1990) (actual authority in the

consent of wife who had "recently moved out of the residence" and had been victim of spousal

abuse two months before even though the defendant had changed the locks to the house); *United

States v. Long*, 524 F.2d 660, 661 (9th Cir. 1975) (actual authority in the consent of wife who

had left the home in fear for her safety despite the fact that "[t]he keys which [she] had for the

house no longer fit the locks"). The Court finds the reasoning of those cases persuasive.

The officers were entitled to credit McIntyre's account that she was the victim of domestic abuse on December 9, 2013, and was thus forced out of the house. Accordingly, the Court finds that McIntyre had at least apparent authority to consent to a search of the apartment.[19]

However, Turner's apartment was locked at the time of the officers' entry. The Court must therefore consider whether McIntyre's general consent to the apartment search was sufficient to entitle the officers to force entry into the apartment. The Court concludes that it was not. *See, e.g.*, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S. Ct. 774 (1970) ("[T]his Nation's traditions . . . are strongly opposed to using force without definite authority to break down doors."); *Florida v. Jimeno*, 500 U.S. 248, 251-52, 111 S. Ct. 1801 (1991) ("It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk . . . ."); *United States v. Restrepo*, 890 F. Supp. 180, 196 (E.D.N.Y. 1995) ("A general or specific consent is not implied to include permission to do physical damage as in breaking something open."); *United States v. Rojas*, 906 F. Supp. 120, 130 (E.D.N.Y. 1995) (consent to search apartment did not authorize officers to cause physical damage to the apartment); *United States v. Washington*, 739 F. Supp.

---

[19] To be sure, the factual record upon which this conclusion is based is scant; it is based entirely on the word of Erica McIntyre, as there is nothing in the way of traditional indicia of residency to suggest that she ever actually lived at the apartment. In that regard, the defense argues forcefully that there are substantial reasons to doubt her veracity in its entirety. *See* Def.'s Mem. L. at 23-26, 29-33. However, as discussed above, the focus of the analysis is on the officers and the facts available to them when they made their determination to rely on her apparent authority. The Court concludes that the officers were entitled to credit McIntyre's account that she lived at the apartment and left because of the abuse she suffered at the hands of Kowan Turner. While it is true that there were no visible marks on McIntyre's person and that the purported abuse had taken place at least 36 hours before she fled the apartment "in a panic," Tr. 640:12 (DeFilippis), the Court is not prepared to find that her account should be dismissed out of hand because she did not leave the apartment immediately or present with more discernible injuries. One of the officers testified that at the time of the interview, McIntyre was nervous and appeared in fear of the defendant. Moreover, the fact, apparently uncontested, that McIntyre was homeless prior to moving in with Turner may reasonably account for the absence of any of her personal effects in the apartment.

546, 550 (D. Or. 1990) (consent to search of trunk was limited to opening of trunk with a key and did not extend to removal of car seats to access trunk).

Therefore, the officers needed either McIntyre's assistance or a second level of consent in order to *enter* the apartment.[20]  The decision in *McGee* is instructive in this regard.  564 F.3d at 137.  In that case, the police obtained a live-in girlfriend's consent to search the defendant's residence.  The girlfriend told the police that she lived with the defendant but that he had taken away her keys after she told him she was planning to move out.  *Id.*  After the girlfriend asked the officer to break down the door so she could collect her belongings, "[t]he officer refused, but informed her that as a resident of the location, she could break a window to let herself in, as long as she could show proof that she resided there."  *Id.*; *see also Backus*, 349 F.3d at 1303 (complainant, who had keys to lower lock but not the deadbolt lock, "was being kept at a safe place nearby [and] gave officers permission to open the door by force, which they did."); *Clay*, 2014 WL 657183, at *4 (officers stopped consent-based apartment search upon encountering a locked closet door and only broke into the closet after obtaining a warrant).  Here, the officers did not contact McIntyre to request her assistance to enter the apartment or her permission to use force, and therefore in the absence of a warrant, or simply knocking on the door of the apartment, an additional layer of consent was needed.

The officers apparently believed this to be the case, and it is for that reason, and in the absence of McIntyre's participation, that they sought out Winfred Turner.  Thus, the officers' entry into the apartment was valid only if Winfred Turner properly and voluntarily consented to the apartment search.

---

[20] In its closing statement, the government argued that, "in executing a search warrant or executing lawful authority to conduct a search, force is permissible in order to do that."  Apr. 28, 2014 Tr. 660:19-21 (DeFilippis).  However, the government has not cited any case law to support its argument that the officers could forcibly enter where there is valid consent to *search* the premises.

c. *Winfred Turner's Authority to Consent to the Apartment Search*

As a preliminary matter, the Court finds that Winfred Turner's authority over the apartment is similar to that of a superintendent, landlord, or hotel manager. Courts have consistently rejected the authority of superintendents, landlords, and hotel managers to consent to searches of property occupied by tenants and hotel guests. *See, e.g., Randolph*, 547 U.S. at 112 ("A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant"); *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992) (per curiam) (noting an investigator's belief that landladies are generally authorized to consent to a search of a tenant's premises to be erroneous even if they are authorized to enter for limited purposes); *United States v. Garcia*, 690 F.3d 860, 862 (7th Cir. 2012) (comparing superintendents to other types of individuals who may have keys to a residence—"a neighbor, a relative, a cleaning service, a babysitter, a dog walker, the person who feeds the cat when the homeowner is away, . . . hotel staff . . . or other institutional staff"—for the point that "[i]f anyone with a key can permit police to search a person's home, . . . personal privacy would be considerably diminished"); *United States v. Hardin*, 539 F.3d 404, 425 (6th Cir. 2008) (apartment manager employing a ruse regarding a water leak did not obtain consent "when he entered [defendant's] apartment; he simply used his own key and entered the unit," and entry was therefore illegal). It is undisputed that as the superintendent, Winfred Turner had access to all of the apartments in the building. He testified that he used his son's apartment infrequently, and only if he needed to use the bathroom. However, Winfred Turner did not have any measure of control over Kowan Turner's apartment. Accordingly, Winfred Turner's authority with respect to his son's apartment was limited to that of a superintendent, and he therefore could not consent to a search of the apartment.

26

However, even if Winfred Turner had authority to consent to the apartment search, the Court must still consider whether he voluntarily assisted the officers. As recited above, Winfred Turner's account of his encounter with the police is in direct conflict with the officers' testimony. The Court finds Winfred Turner's account credible.[21] Winfred Turner testified that he only consented after the police threatened to report him to his employer. Because Winfred Turner has worked and lived in the Morris Avenue building for 32 years, this threat is particularly significant.

It is well-established that consent to a search will be found involuntary if it is found to be "the product of duress or coercion, express or implied, . . . to be determined from the totality of the circumstances." *Schneckloth*, 412 U.S. at 227; *see also United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) ("Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority" (internal citation omitted)). Given that Winfred Turner stood to lose both his livelihood *and* his home as a result of the threat here, there is considerable reason to doubt that his decision to assist the police was a "free and unconstrained choice." First, Winfred Turner testified that he believed that his decades-long employment would be in jeopardy if he did not consent. The Second Circuit has noted that "coercion may be found where one is given a choice between one's employment and one's constitutional rights." *Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d Cir. 2001) (finding consent to search racetrack dormitories where New York racing industry employees lived involuntary where the employment license application the employees signed included notice of possible room searches but there was no evidence that employees knew of right to refuse consent); *see*

---

[21] The Court notes that Winfred Turner testified both at Kowan Turner's bail hearing on March 26, 2014, and at the suppression hearing on April 28, 2014. Winfred Turner appeared to back away from certain aspects of his earlier testimony when he testified at the suppression hearing, but not from the threat the officers made to call his employer. Tr. 619:11 (W. Turner).

*also United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974) (noting that incriminating statements obtained as the result of economic sanctions such as the loss of one's job will be rejected "where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his free choice . . . ." (internal quotation marks and citations omitted)).  Here, the threat to Winfred Turner's job of 32 years was surely "sufficiently appreciable" to render his consent involuntary.

Similarly, courts have found threats to one's home like that faced by Winfred Turner here to render involuntary individuals' consent to search their premises.  *See, e.g.*, *United States v. Kampbell*, 574 F.2d 962, 963 (8th Cir. 1978) (consent coerced where defendant was told, after refusing to consent, that a search warrant would give the police "the authority to tear the paneling off the walls"); *United States v. Taft*, 769 F. Supp. 1295, 1306 (D. Vt. 1991) (consent involuntary where, *inter alia*, police threatened that the suspect's "house would be torn up if a search warrant had to be obtained"); *see also McCadd v. Murphy*, 763 F. Supp. 2d 1018, 1024 (N.D. Ill. 2010) (issue of fact existed as to whether mother's consent to search of home was voluntary where testimony supported a factfinder's determination that her "consent was the product of coercion . . . , including officers' statements that she might lose her home and her fear that officers would beat up her son if she did not give consent"); *United States v. Williams*, Cr. No. 12-100, 2012 WL 3550467, at *2 n.3 (E.D. Pa. Aug. 17, 2012) (defendant's allegations that "the officers informed [third party] that if she did not consent to the search, she would be arrested and lose her house, her job, and custody of her two children [are the] . . . types of threats [that] would certainly negate the voluntariness of her consent").   The Court therefore finds that Winfred Turner's consent was involuntary.[22]

---

[22] The government relies on *United States v. Mullens*, 536 F.2d 997 (2d Cir. 1976), for the proposition that Winfred Turner's will would not have been overborne by the officers' alleged statement about "calling the job."  Tr. 664:1-

Finally, even if he could grant consent to search the apartment, and even if he was not coerced, for the reasons set forth below, the fact that Winfred Turner had access to his son's apartment does not establish his authority to consent to the search of his son's closet, much less the bag.  Accordingly, Winfred Turner's facilitation of the officers' entry into Kowan Turner's apartment cannot render the search constitutional.

### d. Extension of McIntyre's Consent to the Defendant's Backpack in Closet[23]

The Court must consider not only whether there was valid consent to search the apartment, but also whether that consent extended to the search of the defendant's backpack in the closet.  As an initial matter, there is no dispute that the backpack actually belongs to Kowan Turner.  There is also no claim of joint control over the backpack.

Consent to search an area is distinguishable from consent to search an object or closed container located within that area.  *See, e.g.*, *United States v. Karo*, 468 U.S. 705, 725, 104 S. Ct. 3296 (1984) (O'Connor, J., concurring) (even "[a] homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home").  As the Second Circuit has noted, "[W]hen considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in *the object* apart from his expectation of privacy in the home."  *United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002) (emphasis in original).

---

10 (DeFilippis).  In *Mullens*, the court held the defendant's consent for a search of his residence valid where it was provided after the detention of his parents.  536 F.2d at 1000.  The defendant's argument turned on a Secret Service agent's statement that the defendant's mother could be prosecuted for possession of counterfeit bills:  "We really have the goods on your mother . . . ."  *Mullens*, 536 F.2d at 999.  However, in that case, the Second Circuit emphasized the fact that the defendant voluntarily went to police headquarters after his parents' detention and only once there made several admissions.  *Id.* at 1000 (noting that the defendant initiated the bargaining process with the police and Secret Service).  *Mullens* is a far cry from the situation presented here.  Winfred Turner did not initiate the encounter with the police; the Anti-Crime Unit arrived at his door unannounced to ask him for the key to his son's apartment.

[23] The government does not suggest that Winfred Turner had authority to grant consent to search the bag.

In a closely analogous case from the Eastern District of New York, the court considered whether the consent provided by the defendant's grandmother, who was the actual owner of the apartment she shared with the defendant, as well as the owner of the furniture in the defendant's bedroom, extended to a search of "certain locations in the [bedroom] closet where evidence was found—inside the pocket of a jacket hanging in the closet and inside or on top of a box sitting on the hanging rod in the closet." *United States v. Chisholm*, No. 07-CR-795 (NGG)(MDG), 2009 WL 29313, at *7 (E.D.N.Y. Jan. 5, 2009). There, the court accepted the findings of the magistrate judge that it was "likely that [the grandmother] would have put away the defendant's clean laundry into the dresser and otherwise tidy up [his] room." *Id.* at *9 (internal quotation marks and citation omitted). Like the instant case, the government in *Chisholm* did not present any evidence that the party providing consent "had permission or interest in arranging the items in the closet, let alone in going through" the items in the closet belonging to the defendant. *Id.* (internal quotation marks omitted). The court ruled that, even though the grandmother had access and control over the defendant's bedroom and exercised common authority over the bedroom furniture, she did not have authority to consent to a search of the items in the defendant's jacket pocket. *Id.* at *7, *10. The government presents a weaker case here because McIntyre did not have actual authority over the premises. *See United States v. Orejuela-Guevara*, 659 F. Supp. 882, 889 (E.D.N.Y. 1987) (valid consent to search second bedroom did not justify search of third bedroom where the consenting resident did not have "common authority over or an implied right of access to the containers in" the third bedroom's closet).

In *United States v. Sparks*, No. 03 CR. 269(DAB), 2004 WL 307304, at *7-8 (S.D.N.Y. Feb. 19, 2004), *aff'd*, 287 F. App'x 918 (2d Cir. 2008), the court applied reasoning consistent with *Chisholm* to find that a driver's consent to a search of his rental car extended to a black tote

bag located in the passenger side back seat, which was ultimately determined to belong to the passenger and not the driver.  The consent was found valid in *Sparks* in part because neither the driver nor the passenger ever said or did anything to suggest that the bag belonged to the passenger.  *Id.* at *8.  The court distinguished the Fifth Circuit's holding in *United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996), where that court ruled that a car's driver did not have actual or apparent authority to consent to a search of suitcases located in the trunk after the driver had specifically informed the police that the suitcases belonged to the defendant passenger.  The court noted that *Jaras* was inapposite because the driver in that case limited the scope of the search "[b]y explicitly enumerating which bags were his in giving his consent."  *Sparks*, 2004 WL 307304, at *8 n.6.  *See Jaras*, 86 F.3d at 390 ("[I]t was within [the driver's] rights to define the parameters of the search, and his remark that the suitcases belonged to Jaras, regardless of its truth, clearly limited the scope of his consent.").  Importantly, the Second Circuit endorsed this reasoning in affirming the district court's decision.  *Sparks*, 287 F. App'x at 920 (noting that the reasonableness of the police's belief in the driver's authority to consent to the tote bag search "could have been dispelled if, for example, either [the passenger or the driver] had indicated that the Tote Bag . . . was his.").

Here, McIntyre told the police prior to the search that the guns belonged to Turner and that he kept them in his backpack.  She was not asked any further questions to establish her own ownership, control, or use of the backpack.  Without more, even if McIntyre had apparent authority to grant consent to search the apartment, the consent could not extend to the search of a closed container known to be controlled by the defendant that was located in his closet.[24]  *See*

---

[24] The government argues that the absence of a lock on the backpack meant Turner assumed the risk that McIntyre would consent to its search. Tr. 723:24-724:3 (DeFilippis).  Whether the item to be searched contains a lock is not determinative.  "[W]hile the presence or absence of locks and keys can provide important clues as to whether the

*United States v. Purcell*, 526 F.3d 953 (6th Cir. 2008) (girlfriend did not have apparent authority to consent to search of backpack in shared hotel room where her apparent authority had dissipated after only men's clothing was found in a nearby duffel bag).  The contents of the backpack must therefore be suppressed.  To hold otherwise would jeopardize the consent doctrine's intended function as a "jealously and carefully drawn exception."

Contrary to the government's position, the Court's conclusion on the facts here does not require the Court to engage in "metaphysical subtleties" in their analysis of a third party's authority to consent to a search.  *See Buettner-Janusch*, 646 F.2d at 766.  In *Buettner-Janusch*, the Second Circuit held that an undergraduate research assistant and a professor had actual authority to consent to a search of the defendant's laboratory where both the research assistant and the professor had keys to the laboratory and each had a right to use certain equipment.  646 F.2d at 765.  Though the defendant argued that the consent to search the laboratory did not extend to searches of "the fume hood, cabinets, cold room, and freezer," the court recognized— without engaging in the "metaphysical subtleties"—that the defendant forfeited his reasonable expectation of privacy in those items by granting the research assistant, the professor, and eight other individuals permission to use the area.  *Id.* at 766.  Likewise, here "there is no need to enter the realm of 'metaphysical subtleties,' because there are no facts to support the conclusion that [McIntyre] had common authority over or an implied right of access to" the backpack or the guns.  *Orejuela-Guevara*, 659 F. Supp. at 888-89 (internal citation omitted).  Indeed, the officers

---

titular owner has authorized access by the third person who consents to entry by the police, it does not necessarily answer the question."  *McGee*, 564 F.3d at 141.

Courts have been unwilling to categorically deny protection to closed containers simply because they are not locked. *See, e.g.*, *Chisholm*, 2009 WL 29313, at *8 ("An adult's dresser drawer is generally recognized as a place where a person can place private items and can expect them to remain private."); *United States v. Taylor*, 600 F.3d 678, 683 (6th Cir. 2010) (determining that a shoebox, though "concededly not 'luggage,'" is "an often-used storage container" entitled to protection); *United States v. Robinson*, 999 F. Supp. 155, 162 (D. Mass. 1998) (finding a black vinyl case to be "similar in its usual function to a briefcase" in that "[a] person may place private items in such a container and expect them to remain private").

were aware of several facts establishing Turner's ownership and exclusive use of the backpack. In any event, if there was any ambiguity regarding McIntyre's authority to grant consent to search the bag—and the Court finds that there was not—it was up to the government to dispel it.

The Supreme Court specifically noted when it established the doctrine of apparent authority that the police are not free to simply take information at face value. *Rodriguez*, 497 U.S. at 188 (apparent authority "does not suggest that law enforcement officers may always accept a person's invitation to enter premises.  Even when the invitation is accompanied by an explicit assertion that the person lives there, *the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry*." (emphasis added)).  As in the Eastern District of New York's decision in *United States v. Gonzalez Atehorta*, the bare facts known to the Anti-Crime Unit officers "cry out for further inquiry, and when this is the case, it is not reasonable for the police to proceed on the theory that ignorance is bliss."  729 F. Supp. 248, 257 (E.D.N.Y. 1990) (quoting 3 W. LaFave, *Search and Seizure*, § 8.3(g) (2d ed. 1987) (internal quotation marks omitted)).  *In Gonzalez Atehorta*, the court ruled that a girlfriend did not have actual or apparent authority to consent to a search of the defendant's apartment where she was "invited . . . to spend some time in the apartment, as his guest," and she told the police that she was living there but only for "a very short time, a little over a week."  729 F. Supp. at 257.  The girlfriend also produced identification listing an address in another state, further diminishing her authority to consent to the apartment search.  *Id.*  There, the court suppressed the evidence because the police "opted to remain ignorant rather than ask a few pertinent questions that could have clarified the situation."  *Id.*[25]  Similarly, the members of

---

[25] *See also United States v. Griswold*, No. 09-CR-6174, 2011 WL 7473466, at *5, *6 (W.D.N.Y. June 2, 2011) (citing "ignorance is bliss" principle in finding that the police did not have a reasonable basis to conclude that mother had authority to consent to search of the defendant's laptop where they knew the laptop belonged to the defendant and that it was password-protected, but "made absolutely no inquiry about what relationship [the mother]

the Anti-Crime Unit knew the guns belonged to Turner, and that he kept them in a backpack in his closet, but decided not to ask—or were negligent in failing to ask—whether McIntyre ever used or accessed the guns, the backpack, or the closet.

Accordingly, while the information elicited by the officers was arguably sufficient to establish McIntyre's apparent authority to grant consent to a general search of the apartment, the same cannot be said of the backpack in the closet. [26]  As the Supreme Court first cautioned in *Rodriguez*, "further inquiry" was required.  The supervisors on the scene were evidently aware of this, as both Sgt. Gonzalez and Sgt. Bohr testified that they declined to execute the search just on the consent that had been provided by McIntyre.

The government bases its argument that the scope of McIntyre's consent encompassed the backpack search on two principles.[27]  *See* Letter of AUSA Andrew J. DeFilippis, dated April 30, 2014 ("Government's Letter").  First, the government contends that McIntyre's consent to

---

had to the contents of her son's laptop and instead simply asked her to sign a consent to search form"); *United States v. Davis*, No. 3:07-CR-00124-B, 2008 WL 80755, at *5 (N.D. Tex. Jan. 8, 2008) (citing *Gonzalez Athehorta* for the principle that officers "chose to remain ignorant" in "bypass[ing]" the physically present owner of the premises and instead relying on the unlawful consent of a third party who had only been staying in the home for a short time and was moving out at the time of the search).

[26] Whether McIntyre had apparent authority to grant consent to search the closet is also a close question.  As described above, the officers testified that McIntyre told them that Turner kept the backpack in his closet.  However, the officers did not testify to any discussion with *McIntyre* about *her* use of the closet.  In her testimony, McIntyre was clear that she did not use the closet.  As the government is relying on the theory of apparent authority to consent, it was up to the officers to establish that they had a reasonable basis to conclude that she had some measure of control over the closet.  Because the Court concludes that McIntyre could not give consent to search the backpack in any event—and that there was no basis for the officers to conclude that she could—it assumes without deciding that her general consent extended to the sole closet in the apartment.  *See Chisholm*, 2009 WL 29313, at *10 (finding that even if grandmother could consent to a search of the closet, she "did not have the required actual or apparent authority to grant consent to a search of the locations of the closet where evidence was seized").

[27] The government also argues that the Court should assume, on the basis of the testimony of the officers and McIntyre, that McIntyre actually executed the consent to search form, and that she actually granted consent to search the entire apartment.  Tr. 652:2-653:15 (DeFilippis).  Given the inherently contradictory testimony of the officers concerning the circumstances under which she purportedly signed the consent form, *see supra* pp. 6-9, and the implausible set of circumstances that resulted in the disappearance of all of the multiple copies of the form she purportedly signed, the Court declines to assume the existence of the form.  In any event, whether McIntyre consented to a search of the entire apartment is not the issue.  The issue is whether she had apparent authority to consent to the search of the bag, and such authority cannot be created simply by signing a consent form.  Thus, even if the government were to produce the form, the analysis would be the same.

34

search the apartment extended to the backpack because the bag did not "obviously" belong to Turner.  Second, the government claims that Turner "assumed the risk" that McIntyre would consent to a search of the bag because he did not take any steps to shield the backpack from her or anyone else.  Neither ground can save this search.

The government bases its first point, that Turner failed to establish that the bag was obviously and exclusively his, on *United States v. Snype*, 441 F.3d 119 (2d Cir. 2006).  In *Snype*, the Second Circuit ruled that a tenant's consent to search her apartment included the search of a knapsack and red plastic bag belonging to the defendant found on the floor of the bedroom.  According to the tenant, she had only met the defendant—who had committed an armed robbery days earlier—the day of the search, when her boyfriend asked if the defendant could spend the night in her apartment.  *Id.* at 127.  The court rejected the defendant's argument that the tenant could not consent to the search of his knapsack and bag.  *Id.* at 136.  The Second Circuit noted that the defendant was "obliged to adduce credible evidence demonstrating that these items were obviously and exclusively his."  *Id.* (citing *United States v. Zapata-Tamallo*, 833 F.2d 25, 27 (2d Cir. 1987) (per curiam)).  While the court further stated that this "burden is not easily satisfied," it did not set forth any criteria required for such a showing.  *Snype*, 441 F.3d at 136.

The Second Circuit in *Snype* did reference several facts supporting its conclusion that the resident's consent supported a search of her entire apartment and all items found in it.  First, the court noted that the officers did not observe the defendant carrying either the knapsack or the bag, and that there were no marks on the objects identifying his ownership.  *Id.*  Next, the court rejected the defendant's argument that he established his ownership of the bags by virtue of the fact that they were found in the same room where he was arrested.  *Id.*  Finally, the court stated that the discovery of rounds of ammunition in the living room—coupled with the fact that the

robbery under investigation was the object of a conspiracy among several persons—"necessarily raised the possibility that various persons in the apartment might share possessory interest in the items searched." *Id.* at 136-37.

The facts here are markedly distinct from those in *Snype*. First, unlike the instant case, there was no question in *Snype* that the person who gave consent was the *actual* and *exclusive* resident of the apartment and could therefore conceivably give consent to search the entire apartment and all of the containers therein. The defendant in *Snype* had *no* connection to the premises until the day of the search. Here, those roles are reversed: it is the defendant who is the actual occupant of the apartment while the person giving consent, McIntyre, had only a tenuous connection with the apartment, which, as discussed above, satisfied the requirements for apparent authority, but just so. While McIntyre may have had apparent authority to give consent to search the apartment, the circumstances of her known connection to the apartment were not such as could lead an officer to reasonably conclude that she had authority to search all of the containers that could conceivably be found therein. Specifically, the police were well aware that the apartment here belonged to Turner. Because McIntyre left the residence without the intention of returning, and because there was no assertion that she left any of her property in the apartment, it was not reasonable for the police to conclude that she had authority to consent to a search of any object remaining in the apartment. Furthermore, the backpack found in Turner's apartment was not visible on the bedroom floor, as it was in *Snype*. Turner kept the backpack in his closet, which, according to the officers' testimony, was the only area of the apartment that was closed. Finally, there was no allegation of a conspiracy here. At the time of the search, Turner lived alone in his single-room apartment and was being arrested for an act of domestic

36

violence.  Thus, there was no "possibility that various persons in the apartment might share possessory interest in the items searched."  *Snype*, 441 F.3d at 137.[28]

Similarly unavailing is the government's reliance on *Zapata-Tamallo*, on which *Snype* is premised.  In *Zapata-Tamallo*, Drug Enforcement Administration agents conducting surveillance observed the defendant carrying a blue duffel bag before entering an apartment.  833 F.2d at 26. The agents went to the apartment and received the owner's consent to search the premises.  *Id.* After detaining the suspects present in the apartment—who were mere visitors—the officers found the blue duffel bag under the bed of the apartment's bedroom.  *Id.* at 27.  The court decided that the defendant had offered no proof that he had a legitimate expectation of privacy in the bag.  *Id.*  Although the officers previously observed the defendant with the bag, the court upheld the search because the defendant "failed to prove that the bag was obviously his."  *Id.* (internal quotation marks and citation omitted).

The government's reliance on *Zapata-Tamallo* is unavailing for the same reasons as its reliance on *Snype*.  As in *Snype*, the apartment in *Zapata-Tamallo* actually belonged to the third party who provided consent, and the defendant had no meaningful connection to it.  Here, by contrast, Turner was the sole resident of the apartment at the time of the search.  And because

---

[28] The D.C. Circuit distinguished *Snype* in *United States v. Peyton*, 745 F.3d 546 (D.C. Cir. 2014).  In *Peyton*, the defendant shared a one-bedroom apartment with his great-great-grandmother, with both on the lease.  *Id.* at 549. The great-great-grandmother consented to a search of the entire apartment, but identified to the officers the area near the defendant's bed as where the defendant "keeps his personal property."  *Id.* (internal quotation marks and citation omitted).  One of the officers searched a closed shoebox located in that area, finding marijuana, crack cocaine, and $4,000 in cash.  *Id.* at 549-50.  The court ruled that apparent authority did not exist in the great-great-grandmother's consent because the shoebox "was next to the defendant's bed, in an area the great-great-grandmother described as containing his 'personal property.'"  *Id.* at 555 (footnote omitted).  Relevantly, the court noted that the outcome would have been the same, even if the "obviously and exclusively" principle from *Snype* was found to apply.  *Id.* Specifically, the great-great-grandmother's statement to the officers, and the officers' knowledge of the shared living arrangement between her and the defendant, "was 'positive information' that arguably made it 'obvious' that the closed shoebox belonged specifically to [the defendant]."  *Id.*  Similarly, the officers' knowledge here that Turner lived alone at the time of the search and kept guns in the backpack in the closet—coupled with their (1) knowledge that McIntyre abandoned the apartment, and (2) willful blindness to McIntyre's ownership or control over the backpack—suggests that the officers were on notice that Turner maintained an exclusive possessory interest in the bag.

McIntyre told the officers that she left the apartment without the intention of returning, Turner was entitled to the presumption that all objects remaining in the apartment—except perhaps for "some clothes and personal items" that McIntyre said she had left behind—were his. Thus, the considerations that drove the decisions in *Snype* and *Zapata-Tamallo* are not present here.[29] *Cf. United States v. Isom*, 588 F.2d 858, 861 (2d Cir. 1978) (finding that a tenant had the authority to consent to a search of a locked box belonging to the defendant where the defendant "never asserted ownership of the box" and instead told the police that he did not know what the box was or that he had a key to the box).

Snype and *Zapata-Tamallo* are based on *Isom*, and the rationale of *Isom* is that an individual with few if any ties to a particular place should be required to make a showing of a privacy interest sufficient to entitle him to insist that a container located therein not be searched without his consent. On the facts of this case, the government's argument that it is *Turner* who should be required to show that the closed bag in a closed closet in his apartment was "obviously

---

[29] In *United States v. Haqq*, 278 F.3d 44 (2d Cir. 2002), the Second Circuit discussed the significance of the fact that the defendant was the sole resident in the premises to his expectation of privacy in an item found during the search. There, the defendant challenged the constitutionality of a warrantless search of a suitcase found inside the two-bedroom apartment he shared with his fiancée, his fiancée's son, and two other men. *Id.* at 45. The officers in *Haqq* entered the home to execute warrants for the defendant's arrest and found the suitcase on top of a bed while conducting a protective sweep. *Id.* The testimony at the suppression hearing revealed that the suitcase belonged to Reginald Peavy, one of the other men who stayed in the apartment, and that he slept in the bedroom in which it was found. *Id.* at 46. However, the defendant had used the suitcase on a trip from which he had returned the morning of the search, and he had placed the suitcase in Peavy's room upon his return. *Id.* at 47. The Second Circuit vacated the district court's holding that the search of the suitcase violated the defendant's reasonable expectation of privacy in his home and remanded for consideration of the defendant's expectation of privacy in the suitcase. *Id.* at 45. In so doing, the Second Circuit distinguished the facts of the case from *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149 (1987). In *Hicks*, the officers entered the defendant's apartment after a bullet was fired through the floor of the premises. 480 U.S. at 323. The officers found and seized three weapons before turning their attention to "two sets of expensive stereo components, which seemed out of place in the squalid and otherwise ill-appointed four-room apartment." *Id.* After moving the components to observe and record serial numbers, the officers obtained and executed a warrant for stereo equipment. *Id.* at 323-24. The court in *Haqq* noted that "there was no question [in *Hicks*] about who had custody and control of the stereo equipment—Hicks was apparently the sole resident of the apartment in which the equipment was found . . . ." *Haqq*, 278 F.2d at 51. The Second Circuit interpreted the Supreme Court's holding that the defendant in *Hicks* had a reasonable expectation of privacy in the equipment to "reflect[] a conclusion that exclusive custody and control of an item within one's home is sufficient to establish a reasonable expectation of privacy in that item." *Id.*

and exclusively" his would turn that logic on its head.  For these reasons, the Court declines to find apparent authority to search the backpack on the facts presented.[30]  Unlike *Snype*, *Zapata-Tamallo*, *Isom*, or *Haqq*, the facts available to the officers here could not have resulted in any uncertainty as to whom the bag belonged.  To rule otherwise would essentially reward the officers for taking "the path of least resistance" and leaving stones unturned.  *Gonzalez Athehorta*, 729 F. Supp. at 258.

The government's second argument that Turner "assumed the risk" that McIntyre would consent to the backpack search by not preventing her access to the bag is similarly unavailing.  The government grounds its argument on *United States v. Berkolayko*, No. 08 CR 1327(HB), 2009 WL 3030303, at *6 (S.D.N.Y. Sept. 22, 2009), where the court determined that FBI agents could have reasonably believed a live-in nanny's right of access extended to a closet that "was separated from the living room only by a curtain."  Even though the nanny in *Berkolayko* was "neither asked, nor did [she] volunteer, whether she had been instructed not to enter certain areas

---

[30] The government also relies upon *United States v. Lechuga*, 925 F.2d 1035 (7th Cir. 1991), for the argument that Turner was required to establish that the backpack was obviously and exclusively his.  However, the facts of *Lechuga* militate against any reliance on it here.  In *Lechuga*, police officers acting on a tip from a confidential informant conducted surveillance outside defendant Samuel Lechuga's home.  *Id.* at 1036.  The officers observed Lechuga and another defendant drive off together in a car.  *Id.*  The defendants then stopped the car outside an apartment building, entered the building, and exited minutes later carrying small brown paper bags.  *Id.*  Lechuga placed the bags into the car's trunk.  *Id.* at 1037.  Shortly after the two men drove away from the apartment, the officers stopped the car.  *Id.*  After the officers received consent to search the trunk and found the bags, which contained a white powdery substance the officers determined to contain cocaine, they placed the men under arrest.  *Id.*  Lechuga subsequently executed a written consent to search the apartment the men had recently left and provided keys for the officers' entry.  *Id.*  Inside the apartment, which was "completely unfurnished," the officers found an unlocked suitcase in a closet, which contained a brown plastic bag with nearly 1,800 grams of a mixture including cocaine.  *Id.*  The Seventh Circuit ruled that Lechuga's consent to search the apartment extended to the suitcase in part because he had apparent authority over the entire apartment, including the closet where the suitcase was found.  *Id.* at 1042.  The court also noted that Lechuga was "surely aware . . . at the time he gave his consent" that the apartment was unfurnished, which might have led the officers to focus on the suitcase, but that he nonetheless failed to limit the scope of his consent.  *Id.*  The facts of *Lechuga* have little resemblance to the facts here.  Unlike Turner—who was not present when McIntyre provided consent to search Turner's apartment—it was the defendant himself in *Lechuga* who provided consent to search the apartment and did not expressly limit the scope of the search.  And while the suitcase was conspicuous in the unfurnished apartment in *Lechuga*, it is not the case here "that the sparse decor of [Turner's] apartment would focus police attention" on the backpack in the closet.  *Id.* at 1042.

of the apartment," *id.* at *3, the facts known to the police here make *Berkolayko* inapposite. McIntyre explicitly told the police prior to the search that the firearms belonged to Turner, and that the firearms were stored in the backpack Turner controlled. Therefore, there was certainly an "indication that [the backpack] was 'off limits'" to McIntyre. *Id.* at *6.[31]

The government's reliance on *United States v. Bass*, 661 F.3d 1299 (10th Cir. 2011), is similarly misplaced. There, the Tenth Circuit affirmed a finding of apparent authority in a joint occupant's consent to search an unlocked bag lying in the living room of a trailer next to the couch. However, the court in *Bass* determined that "the officers could reasonably believe that [the defendant] had assumed the risk that she might look in the bag for missing items (such as a computer, a magazine, a CD, or even a gun) or . . . allow someone else to examine the contents." *Id.* at 1306 (internal quotation marks and citation omitted). This is not the case here—McIntyre no longer lived in the apartment and did not say anything regarding her own control over the backpack or its contents other than it was where Turner kept his guns. The officers also knew that Turner kept the bag in his closet, not out in the open.[32]

---

[31] The other decisions the government cites do little to support its argument. *See, e.g.*, *United States v. Kinney*, 953 F.2d 863, 867 (4th Cir. 1992) (finding that trial court's conclusion that apparent authority existed in girlfriend's consent to search closet filled with guns was "not unreasonable" where the girlfriend provided the police with keys to the closet); *United States v. Wilburn*, 473 F.3d 742 (7th Cir. 2007) (search was of bedroom and closet that the defendant and the party providing consent *shared*); *United States v. Harrison*, 679 F.2d 942 (D.C. Cir. 1982) (wife had full common authority over the storage area searched, and both she and the defendant kept personal belongings there). Indeed, even the government's cases support the conclusion that McIntyre was unable to consent to the search of the backpack based on the facts known to the officers. *See United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) (finding trial court's admission of evidence seized from son's footlocker to be reversible error because, though son assumed the risk that his mother who shared access to his room would permit the police's inspection of it, the mother's authority "cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area"); *United States ex rel. Cabey v. Mazurkiewicz*, 431 F.2d 839 (3d Cir. 1970) (holding search of garage unconstitutional because only husband had independent right of access and control over the garage despite wife's consent to the search and claim that all her belongings were located in the garage).

[32] Significantly, the Eastern District of New York noted in *Chisholm* that the defendant had "never asked [the grandmother] not to open his . . . closet." *Chisholm*, 2009 WL 29313, at *8. Though the government argues that *Chisholm* is distinguishable because the defendant therein had not "previously shown contents of the searched item to the consenting party," Government's Letter at 3 n.3, the Court does not find this difference to be particularly meaningful. McIntyre testified that she never went into the closet, and only saw one of the guns Turner possessed. The officers seemingly failed to ask questions regarding—and certainly did not testify to having any knowledge

In *United States v. Davis*, 332 F.3d 1163 (9th Cir. 2003), the Ninth Circuit placed the government's assumption of risk argument in proper perspective.  There, the court rejected the argument that the defendant assumed the risk that his housemate would consent to a search of the defendant's gym bag, which was located underneath the bed in a bedroom the defendant shared with another housemate.  *Id.* at 1170.  The police in *Davis* knew both that the bed was not exclusively under the defendant's control and that the bag belonged to the defendant, not the third party who provided consent.  *Id.* at 1168.  Thus, just like the officers of the 46th Precinct, the police in *Davis* "were aware of the actual facts that established [the third party's] lack of authority to consent to the search of [the defendant's] bag."  *Id.* at 1170.  Therefore, the court held that apparent authority could not be found in the housemate's consent.  *Id.*  The court also noted that it had only rarely applied the assumption of risk analysis, and the few cases in which it had done so involved "situations where the person whose property was searched *clearly ceded authority over the property*, either partially or totally, to the consenting third party."  *Id.* at 1169 n.4 (emphasis added).  As in *Davis*, the police here had no reason to believe that Turner ever ceded control over the backpack and its contents, and certainly not to McIntyre.  While the assumption of risk doctrine may retain some force in the consent doctrine, it surely is not meant

---

of—McIntyre's own use of, or control over, the backpack.  Similarly, even if Turner had never expressly forbidden McIntyre's access to the backpack, the officers "had no reasonable basis to conclude" that McIntyre had authority over the bag.  *Chisholm*, 2009 WL 29313, at *10.

Moreover, the fact that McIntyre "knew" what was in the backpack is of little consequence on the facts here.  Government's Letter at 2; *cf. Purcell*, 526 F.3d at 958 (upholding suppression of firearm found during search of hotel room even though girlfriend who consented to the search indicated to the agents that there was a gun in the room, and the gun was ultimately found in a backpack owned by the girlfriend); *see also United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents.  Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched . . ." (internal citations omitted)); *Clay*, 2014 WL 657183, at *1 (even where live-in girlfriend told the police that the defendant kept drugs and a gun in a locked closet and the girlfriend provided consent to search the premises, the officers did not rely on the girlfriend's consent but instead applied for and obtained a warrant before proceeding with the search of the locked closet).

to apply where the police were given every indication that the defendant has at all times maintained control over the property in question.[33]

The government's argument that Turner could have done more to signal his ownership of—and control over—the backpack is unavailing. Because the police knew the firearms belonged to Turner and there was no indication that McIntyre had any control over the bag or its contents, they could not have reasonably believed she had authority to consent to the backpack search.

## III. DEFENDANT'S MOTION TO DISMISS

Under the supervisory powers doctrine, the Court has the authority to dismiss the indictment. However, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment [due to government misconduct] is plainly inappropriate, even though the violation may have been deliberate." *United States v. Morrison*, 449 U.S. 361, 365, 101 S. Ct. 665 (1981) (footnote omitted). Because of this exacting standard, courts rarely dismiss indictments based on governmental misconduct. *See, e.g.*, *United States v. Bellomo*, 944 F. Supp. 1160, 1168 (S.D.N.Y. 1996) ("Dismissal of the indictment for prosecutorial misconduct is an exceedingly rare sanction."); *United States v. Gagnon*, No. 1:06CR21-01, 2006 WL 3328122, at *2 (D. Vt. Nov. 14, 2006) ("It is a rare case where dismissal of an indictment is an appropriate sanction").[34] Turner argues that his prosecution is so littered with perjury and false statements as to warrant such extraordinary relief. The Court disagrees.

---

[33] The Court refuses to place the burden on the defendant to dispel any arguable ambiguity that may have remained as a result of the officers' incomplete inquiry here. *Cf. Gonzalez Athehorta*, 729 F. Supp. at 258 ("[The officer] need not have entered the realm of metaphysical subtleties in this [situation as] he could easily have ascertained the boundaries of [the third party's] authority by asking a few simple questions.").

[34] The defendant acknowledges that the dismissal of the indictment is an "unusual remedy." Tr. 714:8 (Gombiner).

In *Morrison*, the Supreme Court noted that "we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment."  449 U.S. at 366.  Instead, the Court determined the typical remedy in a criminal proceeding to be exclusion of the fruits of the constitutional violation.  *Id.*  Consistent with *Morrison*, courts in this Circuit routinely deny dismissal when presented with Fourth Amendment violations.  *See United States v. Brown*, 602 F.2d 1073, 1077 (2d Cir. 1979) (noting that, even if the officers lacked probable cause to support the defendant's arrest, "the proper remedy would be suppression of the evidence rather than dismissal of the indictment"); *United States v. Giorgi*, No. S86 Cr. 385 (SWK), 1987 WL 16589, at *3 n.2 (S.D.N.Y. Sept. 1, 1987) ("Even if this warrant is found to be unlawful, the proper remedy is suppression, and not dismissal of the indictment."); *see also United States v. Marks*, No. 11-80072-CR, 2013 WL 4502319, at *5 (S.D. Fla. Mar. 5, 2013), *adopted by*, 2003 WL 4502309, at *1 (S.D. Fla. Aug. 23, 2013) ("False statements in search warrant application(s) are not a ground for dismissal of an indictment.").  Significantly, this court endorsed *Morrison* in denying dismissal based on a federal prosecutor's alleged deceit.  *United States v. Shyne*, No. S405-CR-1067-KMK, 2007 WL 1075035, at *1 (S.D.N.Y. Apr. 5, 2007).  The court stated that government misconduct short of demonstrable prejudice warrants suppression, not dismissal.  *Id.* at *19.  As in *Shyne*, suppression of the firearms and ammunition "would put [Turner] in exactly the same position he was in prior to any misconduct."  *Id.*  Accordingly, there would be no prejudice to the defendant if the fruits of the illegal search were suppressed.  Turner's motion to dismiss the indictment is therefore DENIED.

## IV. CONCLUSION

For the reasons set forth above, the defendant's motion to suppress is GRANTED and the defendant's motion to dismiss is DENIED.  In light of the Court's decision, I ask that the government inform the Court by June 23, 2014 whether it will proceed with the prosecution, move to dismiss the indictment or seek appellate review of my ruling, as it is entitled to do under 18 U.S.C. § 3731.

The Clerk of the Court is respectfully directed to terminate the motions (Docs. 15, 17).

It is SO ORDERED.

Dated:    June 2, 2014
          New York, New York

                                                Edgardo Ramos, U.S.D.J.